WHITE RIVER CHAIR COMPANY *v.* CONNECTICUT RIVER POWER COMPANY OF NEW HAMPSHIRE.

November Term, 1931.*

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed November 1, 1932.

*Reargued, May Term, 1932.

26

*Herbert G. Barber, Clinton H. Blake,* and *Marvelle C. Webber* for the plaintiff.

*Warren R. Austin* and *Austin & Edmunds (F. J. Dunn,* of Boston, of counsel) for the defendant.

THOMPSON, J. This is a proceeding in chancery in which the plaintiff, a Vermont corporation, seeks to enjoin perpetually the defendant from maintaining a power house on the westerly bank of the Connecticut River, hereinafter called the river, and a dam extending therefrom across the river, which it constructed and completed during 1909 at a point in Vernon about five miles southerly of plaintiff's premises, and for an accounting for damages.

The plaintiff alleges in its bill that from the time of a certain settlement made by the parties on July 15, 1924, mentioned therein,

"to the present time the defendant has continued to operate its said dam and power house and addition thereto and superstructure thereon, wholly without right as to the plaintiff, so as to continuously cause water to overflow and seep through to and upon the lands of the plaintiff and in times of high water and freshets to cause débris, mud and silt to be deposited upon the lands and in and upon the buildings of the plaintiff and to cause great injury and damage to its lumber, manufactured stock, buildings, machinery and appliances and has caused great and irreparable injury to the business of the plaintiff in the sale of its manufactured products by reason of dampness in and about the plaintiff's premises which the plaintiff is unable to detect until after said manufactured goods have gone into the hands of its customers and others and has thereby caused and is causing great and irreparable loss to the plaintiff in the business world and of its reputation as a manufacturer," etc.

The plaintiff alleges further that such wrongful acts constitute "a continuing trespass," and that the court of chancery has jurisdiction to enjoin the same to prevent such trespass from ripening into an easement to the defendant and to prevent a multiplicity of suits.

There was a hearing before the chancellor. A finding of facts was filed, and there was a decree for the defendant dismissing the bill with costs. The plaintiff appealed.

The plaintiff suffered substantial damage from the flood of 1927, and claimed below that it was caused by the defendant's negligence in the construction, maintenance, and operation of its power house and dam. A great deal of evidence was received on this question. The chancellor found:

"The flood of November, 1927, which inundated the plaintiff's premises was an act of God, not foreseen, and of a magnitude and character not to be reasonably anticipated or foreseen by the defendant and there was no negligence of the defendant which effectually concurred with the act of God in producing the damage and injury suffered by the plaintiff in that flood."

No exception to this finding has been briefed by the plaintiff, so this phase of the case is not before us.

The following facts appear from the findings: The plaintiff and its predecessor have manufactured furniture since 1903 in a factory on the northeasterly portion of a lot owned by it on the west side of Vernon Street in Brattleboro. This lot is approximately 520 feet long, measuring north and south, and 800 feet wide. The land to the north is slightly higher than plaintiff's lot, the land to the south is somewhat lower, and from the westerly boundary of the lot the land rises to a steep bank. The easterly line of the lot was about 700 feet westerly from the river before the erection of the dam. Vernon Street, the plant of the Presby-Leland Granite Company and tracks of the Central Vermont Railway lie between the lot and the river.

The plaintiff's main factory, a long wooden building, three stories high, was built in 1903 upon loamy silt which forms the intervale between the high bank westerly of plaintiff's lot and the river. It has a basement with a cement floor which is seven feet deep and about four feet below the level of the ground outside the building. When the dam was built there were ten machines in the basement which were used in the plaintiff's manufacturing business. There is an elevator which runs down to a pit about eighteen inches deep in the basement floor. At the time the factory was built the water table in the ground forming the basement floor was somewhere below the floor.

Prior to the erection of the dam the plaintiff's engine and boiler rooms and the basements of the factory and office buildings were dry and free from moisture.

When the factory building was erected, there was wet soil in the westerly portion of plaintiff's lot, caused by springs on the hill westerly of and adjoining the lot, which extended easterly about 25 feet from the westerly line. A water-bearing stratum came out of the hill near the lot. There was also a stream of water running through the southwest end of the lot and it was wetter in this corner than northerly thereof. The source of this stream was a spring or springs about 50 feet northerly of plaintiff's southerly line. The bank there was full of springs. This stream ran in a ditch dug before the plaintiff located there and ran practically all the time a stream about one foot deep. The overflow from the springs above mentioned flowed through a ditch, which extended from the southwest to the southeast corner of the lot, to a culvert under Vernon Street near the southeast corner of the lot, through the culvert, and then southerly into the river. There were springs and wet land southerly of the lot. The ground water northerly of the lot formed a pool northerly and easterly of the lot and approximately 1,000 feet northerly thereof. There was wet land with aquatic plants growing in it just northerly of plaintiff's line. The contour of the land westerly of plaintiff's premises was an abrupt hill which extended westerly through a part of the village of Brattleboro to the watershed of Cascade Brook, which flowed southerly of plaintiff's lot, and northerly to the watershed of Whetstone Brook.

The defendant is a corporate entity resulting from the authorized consolidation of the Connecticut River Power Company, a corporation chartered and organized under the laws of this State, and the Connecticut River Power Company of New Hampshire, a corporation chartered and organized under the laws of New Hampshire. The object of the constituent corporations was identical, namely, the development of the water power of the Connecticut River for commercial purposes. Each was authorized to construct a dam or dams across the river within certain specified limits; and in most respects the powers conferred and the limitations imposed by their respective charters were in effect the same. See *Vermont Valley R. R.* v. *Connecticut River Power Company of New Hampshire,* 99 Vt. 397, 133

Atl. 367, where the legal status of the defendant as the consolidated corporation and its rights and. liabilities under the provisions of the charters of the constituent corporations are considered so far as required by the issues in that case.

The defendant completed the construction of its dam and power house in the spring of 1909. The dam is of concrete construction, with a spillway 600 feet long. The height of the crest of the dam, that is, the spillway, is 27 feet, and this is at an arbitrary elevation, according to the defendant's datum, of 118. The defendant began using flashboards, which are temporary structures, on the dam in July, 1909. There height was gradually increased from time to time until June, 1913, when it was raised to eight feet above the crest of the spillway.

In finding No. 8, the chancellor found:

"Nothing in the construction or maintenance of this dam, including flashboards as used by the defendant, violates the provisions in either or both of the charters, as referred to in Article 3 of these findings, as to the point or height beyond which the defendant shall not have authority to raise the waters of the Connecticut River."

The Vermont charter provides that the corporation of this State, "in the exercise of the powers granted by its said charter, may hold the flow of said river in storage, as may be necessary for the reasonable development and use of such water power."

Paragraph 9 of the findings is, in part, as follows:

"The defendant acquired by purchase or otherwise, certain flowage rights from riparian owners along said river in the vicinity of the plaintiff's premises, that is, from owners of lands located northerly, easterly and southerly of plaintiff's premises, and erected within said rights and on property outside said rights which, the defendant was permitted to use for that purpose, certain dikes consisting in part of the elevated rights of way of the Boston and Maine Railroad and the Central Vermont Railroad east of the plaintiff's premises and in the remainder of special erections between said railroads and connecting them and between Vernon Street and said Central Vermont Railroad, connecting them, and relocating Vernon Street on a dike extending more westerly than formerly and inclosing land of one Mr. Allen southerly of plaintiff's premises, thereby cutting off the culvert above

referred to and the natural drainage from the hills west of plaintiff's premises and from the hills and lands northerly of the plaintiff's premises and from Mr. Allen's land, as well as the drainage from the plaintiff's premises. The defendant provided for this drainage by installing an automatic pump at the general location of the former culvert which has always operated effectively and successfully, except as hereinafter stated, to provide for said drainage and to take the place of any and all former drainage of sewage and surface waters that formerly passed through said culvert. In the flood of 1927, the automatic pump submerged and of course could not function, and on another occasion the pump house was destroyed by fire and the pump was out of commission for a short time. This arrangement provided effectively for the sewage.''

Paragraph 23 of the findings is as follows:

''The dikes mentioned in Article 9 of these findings were constructed of mixed clay and gravel which was reasonably impervious to water, and their weight somewhat compacted and consolidated the fine material upon which they were built, tending to cut off percolation of ground waters thereunder. Said dikes were constructed at a sufficient elevation and were sufficient in character to prevent water from the Connecticut River flowing over the surface onto plaintiff's land at normal river levels. However, in 1920 and 1921 the water in the Connecticut River was raised to a height above normal level because of ice jams which occurred in the river below this point, thus causing the water to overflow the dikes and flood the plaintiff's property. Thereupon the defendant raised the elevation of the dikes high enough and in such manner as to exclude any flood of previous known magnitude, including the flood of 1862.''

The building of the dam caused the water of the river to be raised and to overflow its natural banks. It overflows some of the land that was formerly the Hunt Farm southerly of plaintiff's premises, and opposite plaintiff's premises it has been raised to practically the same level of the water at the crest of the dam, and is nearer to such premises than formerly. The nearest open water to plaintiff's lot at the present time is ap-

proximately 200 feet from the southeast corner and 300 feet from the northeast corner.

The land at the plaintiff's factory building and in front of the same is approximately at elevation 129, which is 11 feet higher than the crest of the dam. In the spring of 1909, before any flashboards had been placed on the dam, water first appeared in the basement of plaintiff's factory building in such quantities as to interfere with the carrying on of business there, as had before been done. At this time water also began to show on the surface on the southerly and westerly portions of plaintiff's land. Pools of open water appeared upon the land next southerly of plaintiff's land and upon the premises next northerly up to and on plaintiff's north line. All the grounds of the plaintiff outside the buildings are now saturated with water, varying in depth from one foot to two feet under the surface, and this extends downward to a depth of six feet or more below the basement of the plaintiff's factory building.

In 1913 and 1914 the defendant, at its own expense, enlarged certain ditches on plaintiff's land, and built certain other open ditches and some closed ditches all running to the ditch which extends from the southwest to the southeast corner of plaintiff's lot. This system of ditches gathers all open water which is carried down to a sump at the pump house, which is a short distance from plaintiff's southeast corner, but not on its land, and is there discharged across the highway and into the premises of the defendant by the automatic pump referred to in paragraph 9 of the findings.

At the same time the defendant spent large sums of money in raising the floor of the engine room and boiler room, building a substantial addition to the factory building and storage and finishing building to take all manufacturing out of the basement entirely, installing electric machinery to replace steam power, and in doing other things in an endeavor to protect plaintiff's property and business from further damage by water in the basement.

The defendant also installed at its own expense a system of drains in the basement of the factory building which discharge through the south wall of the same into an open ditch. The estimated discharge through this ditch is from 25,000 to 100,000 gallons of water daily. The water in the elevator pit in the basement varies from one to two feet in depth. This water is

discharged from the basement by a siphon system installed by the defendant. All of the water from the basement is carried by the outside ditches to the automatic pump. The basement is damp at all times and this dampness to some degree extends through the factory building.

All of these things were done by the plaintiff pursuant to certain agreements of the parties. At this time the defendant paid $4,580.70 to the plaintiff in full settlement of all claims and demands of the plaintiff to September 1, 1914, for damage resulting by reason of the raising of the water of the Connecticut River as set forth in a certain agreement executed by the parties: This agreement contains the following provision:

"This agreement is not intended to nor shall it release the Power Company from any damages which shall have occurred after September 1, 1914, or which may hereafter occur to the factory, plant, buildings, property or business of said Chair Company by reason of the continuing maintenance by the Power Company of the waters of said Connecticut River at the higher levels hereinbefore described, except as to the present boiler or engine buildings, machinery, and equipment as expressly specified."

At this time the defendant's responsibility for the operation of the siphons for discharging water from plaintiff's basement and elevator pit was discharged, and the plaintiff took over and assumed from that time forward the operation of the siphons. The plaintiff also discharged the defendant permanently from any responsibility on account of injury involved in manufacturing in the basement. The chancellor found that the defendant is not responsible or liable for any injury to plaintiff's manufacturing business conducted in the basement since the release of 1914.

On August 14, 1924, in consideration of the payment of $17,500, and other considerations, the plaintiff released the defendant from all debts, demands, actions, and liabilities whatsoever. It is expressly agreed in this release that the same shall not be construed to nor shall it in any way release the defendant from any damages which might thereafter be sustained by the plaintiff to its real and personal property or business by reason of the construction, operation, or continued maintenance of the dam. It is also further expressly agreed that the pay-

ment of $17,500 and the release shall not be construed to nor shall it in any way admit the liability of the defendant for any damages which had been or might thereafter be sustained by or result to the property, real and personal, or business of the plaintiff by reason of the construction, operation or maintenance of the dam.

The plaintiff has briefed exceptions to four of the findings. The substance of one ground of exception to each of these findings, is the same; that the evidence does not warrant such findings because there is no legal or competent evidence in the case upon which the findings can be predicated, and because the findings are contrary to the evidence and to the weight of evidence produced in the trial. The other grounds of exception will be mentioned as each finding is considered.

█ The rule is that, when the findings of a chancellor are challenged on the ground that they are not supported by the evidence, they must stand if there is any legitimate evidence fairly and reasonably tending to support them. *Houghton* v. *Grimes*, 100 Vt. 99, 105, 135 Atl. 15; *Trask* v. *Walker's Estate*, 100 Vt. 51, 55, 134 Atl. 853; *Town of Bennington* v. *Fillmore & Slade*, 98 Vt. 405, 417, 130 Atl. 137; *Morgan* v. *Morgan*, 82 Vt. 243, 73 Atl. 24, 137 A. S. R. 1006.

█ The plaintiff took many exceptions in the trial below to the admission and exclusion of evidence, some of which were on the grounds that the evidence was immaterial, irrelevant, and incompetent. It has not briefed any exceptions taken to the admission and exclusion of evidence, and such exceptions are therefore waived. *Parry & Jones* v. *Empire Granite Co.*, 90 Vt. 231, 97 Atl. 985; *In re Wells' Will*, 95 Vt. 16, 28, 113 Atl. 822; *Symes* v. *Fletcher*, 95 Vt. 431, 438, 115 Atl. 502; *Bennett* v. *Delphia*, 98 Vt. 492, 496, 129 Atl. 234. So the evidence stands for our consideration as though it were not excepted to.

██ The plaintiff excepted to the first sentence in finding 23, wherein the chancellor found:

"The dikes mentioned in Article 9 of these findings were constructed of mixed clay and gravel, which was reasonably impervious to water, and their weight somewhat compacted and consolidated the fine material upon which they were built, tending to cut off percolation of ground waters thereunder."

The ground of the exception is that "the evidence does not warrant nor justify the finding that said dikes were so constructed, designed and built as to prevent waters percolating through them into and upon the plaintiff's premises."

The plaintiff criticizes certain expressions used by the chancellor in this sentence, but, as no exception was taken to the finding on this ground, these criticisms are not before us for consideration.

The plaintiff's exception misses the point of the finding. In taking the exception it omitted the words "mentioned in Article 9 of these findings were constructed of mixed clay and gravel," which follow immediately after the words "The dikes."

George S. Hewins, a witness called by the defendant, was an expert engineer, engaged in hydraulic engineering and construction. He had had 23 years acquaintance with the dam at Vernon, and he participated in the relocation of Vernon Street, built to serve as a dike. He testified that this dike was built of a material of "a clay, gravel nature." James A. Cushman, another engineer called by the defendant, testified that, in his opinion, if the dike was constructed of clay and gravel it would be impervious to percolating water. But, as we understand the case, the dike was built primarily for a highway and as a barrier to prevent the waters of the river from overflowing on plaintiff's land.

So far as it has been called to our attention, there is no evidence or claim that the underground water, of which plaintiff complains, percolates *through* the dikes. The dikes are built on the surface of the earth; the ground water in plaintiff's premises is below the surface of the earth and percolates through the soil *under* the dikes. It is immaterial what the soil under the dikes is called—whether "quicksand," "loamy silt," or "fine material"—the point of the finding is that the weight of the dikes has somewhat compacted and consolidated the subsoil upon which they were built, and this tends to cut off the percolation of ground water under the dikes. This is supported by the testimony of Mr. Hewins and other witnesses of the defendant. The water percolates through the subsoil, but such percolation is retarded. If the ground water in plaintiff's land is seepage from the river, it cannot be questioned that it percolated into the land through the compacted soil under the dikes. This exception is not sustained.

█ The plaintiff excepted to the chancellor's findings contained in paragraph 9, wherein he found as follows:

"The defendant provided for this drainage by installing an automatic pump at the general location of the former culvert which has always operated effectively and successfully, except as herein stated, to provide for said drainage and to take the place of any and all former drainage of sewage and surface waters that formerly passed through said culvert."

The ground of the exception is: "Because the finding is contrary to the evidence, that is, the provision made by defendant to drain and protect the plaintiff's premises from water has not proven adequate or effective, as is shown by the evidence, and that said finding in this respect is unwarranted."

It appears in finding 9, which we have quoted, that the dikes cut off the culvert under Vernon Street and the natural drainage from the hills and lands westerly and northerly of plaintiff's premises, from the land of a Mr. Allen southerly of plaintiff's premises, and from the plaintiff's premises. It is this drainage that is referred to in the sentence to which the plaintiff excepted.

The plaintiff concedes that this finding confines the drainage taken care of by the pump to "former drainage of sewage and surface waters that formerly passed through said culvert," but complains that it does not take care of percolating water.

The defendant's claim is that the ground water in plaintiff's land is percolating water from the hills and higher land westerly and northerly of plaintiff's premises, and that it is not liable under the law of this State for obstructing or retarding the percolation of the same from plaintiff's land. This claim will be considered later.

The plaintiff's argument seems to be that it appears from the evidence that more water is taken care of by the pump than formerly passed through the culvert; that it is impossible to separate the latter from such excess water, and it asks: "Upon what evidence can the chancellor find that the pump takes care of all former drainage of sewage and surface water that formerly passed through the culvert?"

Mr. Hewin, after describing the pump and its operation and stating that he had observed its operation, was asked, "whether

that pump was effective or not to discharge from the premises the surface drainage and sewage,'' and he replied, ''It was adequate.''

James B. Mahoney, an operating engineer and an employee of the defendant since 1909, was a witness for the defendant. He had observed the operation of the pump since September, 1909. He testified that the surface water, drainage and sewage, which was interrupted by the building of the dikes and the elevation of the water.table of the river, was fully provided for by the pump. The testimony of these two witnesses supports the finding. The exception is not sustained.

The plaintiff does not claim in this Court that it is entitled to a decree on the ground that since July 15, 1924, the defendant has operated its dam and power house ''so as to continuously cause the water of the river to overflow upon the lands of the plaintiff,'' but it does claim that it is entitled to a decree on the ground that the moisture in the basement of its factory building and in its land is water that has seeped from the river because of the dam.

Paragraph 36 of the findings is as follows:

''From the evidence, I am unable to find that the moisture in the basement of the plaintiff's premises and on the plaintiff's land is moisture which has seeped from the Connecticut River. On the contrary, I am more inclined to the opinion that this moisture is moisture which has seeped from premises westerly and northerly of the dikes and not from the river.''

The plaintiff excepted to the first sentence of this paragraph ''because the evidence in said cause does not warrant such findings; because the evidence upon which such findings are based is predicated on incompetent, immaterial and insufficient evidence to prove those facts; because there is no legal or competent evidence in the case upon which said findings could be predicated; and on the ground that such findings are contrary to the evidence and to the weight of evidence produced in the trial.''

What is meant by the statement ''unable to find,'' when used by a trier of fact, was considered by this Court in *McClary* v. *Hubbard*, 97 Vt. 222, 238, 122 Atl. 469, 476. It is there said: ''Such a statement by the chancellor does not necessarily mean

that there was no evidence tending so to show, but it does mean that such evidence, in his judgment, does not preponderate, and so in a legal sense he was 'unable' to make such a finding.'' The plaintiff concedes that this states the law correctly, but it says that the evidence does preponderate in favor of its claim.

As the discussion of this phase of the case concerns water under the ground, we state here that the words "ground water," "percolating water," and "seepage," are used in this opinion, as they were used in the trial below, as meaning the same thing, that is, water under the surface of the earth that passes through the earth by percolation or filtration, as distinguished from water that flows on the surface.

The defendant introduced evidence in the trial below which tended to support its claim that the ground water in plaintiff's land comes from the hills and lands westerly and northerly of its premises.

The plaintiff argues that since the presence of the water in its land is not accounted for in the finding, and the cause of damage is not determined, the defendant failed to establish its claim, and, without that, the bill should not have been dismissed, even if the defense was sound on legal grounds. But the defendant was not obliged to establish its claim by a preponderance of the evidence. It is the plaintiff who had the burden to establish its case by that measure of proof.

While the "burden of proof," in the sense of the duty of producing evidence, frequently spoken of as the burden of *evidence*, may pass from one party to the other as a case progresses, yet the "burden of proof," meaning the obligation to establish the truth of the claim upon which the plaintiff rests his case, is upon him throughout. *Colston* v. *Bean,* 78 Vt. 283, 62 Atl. 1015; *Zeno* v. *Mason,* 90 Vt. 173, 97 Atl. 355; *Rutland Railway, Light & Power Co.* v. *Williams,* 90 Vt. 276, 279, 98 Atl. 85.

When the defendant had introduced evidence tending to prove the fact that the ground water in plaintiff's land came from the hillside and the land north and west of the dikes, the burden was still upon the plaintiff to overcome this evidence by a greater weight of its evidence in order to establish its claim that such ground water seeped from the river. *Colston* v. *Bean, supra; Rutland Railway, Light & Power Co.* v. *Williams, supra.* It necessarily follows that, if the conflicting evidence of the

40

parties is of equal weight, or if the evidence of the defendant outweighs that of the plaintiff, the evidence of the plaintiff does not preponderate.

██ ██ While the exception is not to a positive finding of a material fact, but to a finding that the chancellor is unable to find the fact on which the plaintiff rests its case, the rule for determining whether findings are supported by the evidence applies to the extent that, if there are unchallenged findings or legitimate evidence which fairly and reasonably tend to support the claim of the defendant, we cannot say that the evidence preponderates in favor of the plaintiff, because the credibility of the witnesses and the weight to be given to their testimony was for the chancellor, and not for this Court.

The discussion of this exception by the plaintiff covers 37 pages of one of its briefs. It includes a review of much of the evidence and an attack upon the credibility of some of the witnesses of the defendant and the weight to be given to their testimony. We have considered all that is said in the brief, but it is not necessary to pass upon all the points raised, as there are certain unchallenged findings which are determinative of many of them.

The plaintiff relies greatly upon the testimony of one James Helyar, a civil engineer of 22 years' experience and acquainted with the river and properties thereon, who was one of its principal witnesses.

In the spring of 1930, Mr. Helyar dug six pits in the plaintiff's land, southerly of its buildings and westerly of the dikes, for the purpose of observing the elevation of the ground water therein. Pit No. 1 was just westerly of Vernon Street and Pit No. 6 was near the plaintiff's westerly line, at the foot of the bank. The other pits were between these two. A seventh pit was dug in the bank westerly of plaintiff's lot.

Mr. Helyar observed the levels of the ground water in the pits and of the water of the river for some time. At no time were the water levels of any two pits or of any pit and the water of the river the same. The water levels of Pits Nos. 1 and 2, which were nearest the river, were at all times higher than of the pits westerly of them, with the exception of Pit No. 7. The ground level at Pit No. 7 is approximately 4 feet higher than it is at Pit No. 6, and its ground water level is 4 feet higher than the ground water level in plaintiff's premises. Its water

table is practically the same depth below the surface as it is in plaintiff's land, which is about 2 feet. He made borings in the sub-surface soil to determine, if possible, the depth of the hard strata in plaintiff's land, and found that it was 23 feet below the surface of the earth.

Mr. Helyar testified that the water in the pits rose and fell from time to time, and that it was his opinion that the cause of such rise and fall was the raising and lowering of the water in the river.

Several lay witnesses testified that the water in the basement raised and lowered as the water in the river raised and lowered, the change being noticed within a few hours' time.

The plaintiff's evidence also tended to show that the water entered its basement at the northeast corner of the building, which is the part of the building nearest the river.

Since water seeks the lowest level and follows the line of least resistance, it is apparent that the direction of the slope of the level of the ground water in plaintiff's land is an important, if not a deciding, factor in determining the source from whence such water comes. This is recognized by both parties. Mr. Hewins testified that to have water seep from the river into plaintiff's land, the slope would have to be from the river toward the west.

So far as it has been called to our attention, neither Mr. Helyar nor any other witness testified that, in their opinion, the slope of the ground water level is westerly from the river or that the water in plaintiff's premises is seepage from the river.

The plaintiff, however, argues that the observations of Mr. Helyar of the water levels in the pits, and particularly the fact that the levels of Pits Nos. 1 and 2 were higher than those of the other pits in plaintiff's land; his testimony that the rise and fall of the water in the pits was caused by the raising and lowering of the water in the river; the evidence that the water in the basement rises and falls with the rise and fall of the water in the river; the evidence that the water enters the basement from the northeast corner, indicating that the slope is westerly from the river, and that such water comes from the river; and other evidence, which it is not necessary to mention, show by a preponderance of the evidence that the slope of the ground water

level is westerly from the river, and, therefore, the ground water must be seepage from the river.

The chancellor found:

"The seepage of ground water from the Green Mountains and the hills westerly and northerly of the plaintiff's premises and somewhat easterly thereof works through the ground in a southerly and easterly direction. Before the dam and dikes were built, the seepage went partly to the river and partly to Cascade Brook."

Harold K. Barrows, a consulting hydraulic engineer of 35 years' experience, and professor of hydraulic institute at the Massachusetts Institute of Technology, was called as a witness by the defendant. He is familiar with the river, and had observed the conditions at plaintiff's property. He was asked the following questions:

"Q. Will you state how, in your judgment, the drainage conditions compare, and the effect of the dam, if any, upon the drainage at this property? And explain the basis for your opinion. A. The raising of the level of water in the river opposite the premises of the plaintiff has somewhat affected the level of the ground water adjacent to the river. Ground water is always flowing towards the water level of the river and this raising has changed the level of the water table of the ground water at the river and for a distance back from the river, and, in my judgment, has somewhat affected the level of the ground water in the general vicinity of the plaintiff's buildings.

"Q. What, if any, interference upon the movement of ground water, in your opinion, do the dikes surrounding the plaintiff's property have? A. They hold the water level at this point somewhat higher, but the passage of the ground water towards the river nevertheless continues at a somewhat different slope."

The chancellor also found:

"The water table in the plaintiff's premises has been raised by the erection of the dikes and the raising of the water surface in the Connecticut River caused by the dam, but the slope of the ground water level in the plaintiff's

premises is easterly toward the river and not westerly from the river.''

''As the water in the Connecticut River opposite the plaintiff's property raises and lowers, the water table in plaintiff's property raises and lowers, and the change follows the rise and fall of the river, but within a few hours time.''

''If there were no automatic pump or other device to discharge water from the plaintiff's premises, or if said pump were ineffectual, the surface water and the seepage from the ground higher than the plaintiff's, west of the dike, would rise to overflow the dikes toward the river.''

''The water which seeps into the basement under the factory building of the plaintiff comes principally from the north and west sides of the building.''

■■ The plaintiff excepted to three of these findings on the ground that they were not warranted or supported by the evidence. The exceptions have not been briefed, and are therefore waived; and all of these findings stand unchallenged in this Court. The plaintiff questions whether some of the facts found in these findings are supported by the evidence, but since the findings are unchallenged, questions relating to the tendency of the evidence, or lack of evidence, are not before us. *Bean* v. *Colton*, 99 Vt. 45, 50, 130 Atl. 580. However, we will say that we have examined all of the evidence called to our attention, and that there is legitimate evidence which fairly and reasonably tends to support these findings.

■ The plaintiff claims that certain hypothetical questions which the defendant asked Professor Barrows and other hydraulic experts in the trial below, are not based on sufficient data to give weight to the answers, and it devotes several pages of its brief to argument on this subject. These questions were objected and excepted to in the trial below on some of the grounds relied upon now; but, as we have already held, the exceptions to the admission and exclusion of evidence are waived because they are not briefed. And, exceptions to the admission or exclusion of evidence are not brought to this Court by exceptions to findings on the ground that they are not supported by the evidence.

■ We think the facts included in these findings, and particularly the facts that the slope of the ground water in plaintiff's premises is easterly towards the river and not westerly from it, and that the water which seeps into the basement comes principally from the north and west sides of the factory building, warrant the finding excepted to; and the exception is not sustained.

■ The plaintiff excepted to the paragraph in finding 12, in which the chancellor found as follows:

"The sump underneath the automatic pump is the lowest point near the plaintiff's premises *and the water in it can be all accounted for by water from the hillside and the land west and north of the dikes.*"

The exception is to that part of the finding that is in *italics*. The substance of the grounds of the exception is that the finding is not warranted or supported by the evidence.

It appears from the record that the automatic pump is not on plaintiff's land but on land southerly of it, about 100 feet from the ponded waters of the river; that the place of its location is the nearest that such ponded waters approach the plaintiff's land; and that the elevation of the ground at the pump is about 10 feet lower than the elevation of the ground at plaintiff's factory.

The plaintiff, in support of its exception, relies upon the testimony of Mr. Hewin, on cross-examination, that in his judgment water from the river percolates to the pump in small quantities. He testified, on redirect examination: "I think it is inevitable that some small amount of seepage works back from the river to the pump and is handled by the pump and cast out again. I don't think it affects the plaintiff's basement in any event." He also testified that he had never seen any water from the river at the pump "to recognize it"; and, further, that, when he spoke of the pump keeping water off the plaintiff's premises, he referred to "all drainage water that accumulates in the ditches and flows to the pump."

It is not questioned that the surface drainage from the hillside and the land west and north of the dikes, and the ground water that seeps into the basement of plaintiff's factory building and is discharged therefrom, are carried by ditches to the pump and discharged by it on to defendant's land on the other

side of the dike. The defendant introduced other evidence that supports the finding. A party is not bound by the testimony of his own witness, but may show that the fact is otherwise than he has stated it to be. *Cox* v. *Eayres*, 55 Vt. 24, 28, 45 A. R. 583; *Jennett* v. *Patten*, 78 Vt. 69, 62 Atl. 33; *Boville* v. *Dalton Paper Mills*, 86 Vt. 305, 314, 85 Atl. 623; *Wellman, Admr.* v. *Wales*, 98 Vt. 437, 440, 129 Atl. 317. And we will presume, in favor of the finding, that it was based upon the evidence that supports it. The exception is not sustained. Furthermore, the omission to include seepage from the river "in small quantities" in the water in the sump is harmless, as there is no evidence tending to show that such water, if it enters the sump, percolates into plaintiff's land. The evidence is that it would be handled by the pump and discharged back on to the defendant's land.

This disposes of all the exceptions taken in the trial below which have been briefed.

The plaintiff argues that the findings are legally sufficient to support a decree in its favor; that, if they are not sufficient for that purpose, there should be a remand for specific findings as to whether the water in plaintiff's land is caused by the interruption of seepage from its premises or the surrounding land to the river, and whether the provision for drainage or sewage is inadequate.

In support of this argument, the plaintiff makes the broad statement that: "Interference with drainage from one's land gives ground for relief." We infer, from other statements in the plaintiff's briefs, that it includes in the word "drainage" the drainage of both surface water and ground water. The quoted statement is undoubtedly correct as a general statement of the law as to interference with the natural drainage of surface water; but the plaintiff does not allege in its bill any interference by the defendant with the natural drainage of surface water and sewage from its premises as a ground for relief; and the chancellor found specifically that the automatic pump installed by the defendant is adequate in discharging the surface water and sewage from plaintiff's premises.

We call attention again to the acts of the defendant on which the plaintiff relies in its bill for relief. They are, that since the settlement of 1924, "the defendant has continued to operate its said dam * * * wholly without right as to the plaintiff, *so as to continuously cause water to overflow and seep through to*

*and upon the lands of the plaintiff,"* and in times of high water and freshets to cause débris, etc., to be deposited upon the plaintiff's premises, to its great damage.

The chancellor found that, after the high water of 1921 and 1922, the defendant raised its dikes high enough to exclude any flood of previously known magnitude from plaintiff's premises; that the defendant was not liable for the damage sustained by the plaintiff from the flooding of its premises by the Great Flood of 1927; and that he was unable to find from the evidence that the moisture in the basement of the plaintiff's premises and on the plaintiff's land is moisture which has seeped from the river.

We are unable to perceive how a specific finding that the water in plaintiff's land is caused by the interruption of seepage from its premises by the acts of the defendant could aid the plaintiff, in view of the theory on which it brought and tried its case, and the findings of the chancellor. The plaintiff admits that its claims would have been inconsistent to claim seepage from the river and interruption of the percolation of the ground water from its premises. A finding such as the plaintiff seeks would be inapplicable to the averments and scope of the bill, and could not aid the plaintiff who must recover, if at all, upon the case made by the bill. *Lariviere* v. *Larocque,* 104 Vt. 192, 157 Atl. 826.

On the pleadings and findings, the chancellor properly issued a decree dismissing the bill.

The plaintiff requests, if the decree be affirmed, that the remand provide that it have leave to apply to the court below to amend its pleadings in accordance with the provisions of G. L. 1571, and that the leave be broad enough "to enable the plaintiff to amend the pleadings in any respect that will enable it to get before the court for final disposition its right to damage by reason of any unlawful acts of the defendant causing the damage, or by reason of any contractual rights to damages, or by reason of any charter obligations upon the part of the defendant to pay such damages as it caused."

The plaintiff cites *Tudor* v. *Kennett et al.,* 88 Vt. 291, 92 Atl. 213, *Patch & Co.* v. *First Nat. Bank of Montpelier,* 90 Vt. 4, 96 Atl. 423, and *Whittier* v. *Parmenter,* 90 Vt. 16, 96 Atl. 378, as cases which show that this request is in line with the practice and decisions of this Court. None of these cases sup-

port the contention of the plaintiff. In the first case a decree for the orator, entered after the overruling of the defendant's demurrer to the bill, had been affirmed by this Court. *Tudor* v. *Kennett,* 87 Vt. 99, 88 Atl. 520. The question was whether the court below, on remand, had the power to permit the defendants to file an answer. See *O'Rourke* v. *Cleary et al.,* 104 Vt. 312, 158 Atl. 673. In the other cases this Court, when remanding them, gave the defendants the right to apply to the court below for leave to amend their answers under the provisions of P. S. 1317, now G. L. 1571.

It appears from the record that the only water in or on plaintiff's premises for which the defendant has not made adequate provision for its discharge therefrom is the water in the ground outside of plaintiff's buildings; and that the percolation of this ground water from plaintiff's premises has been obstructed by the acts of the defendant in building the dikes and raising the water surface in the river opposite plaintiff's property by its dam.

The plaintiff assumes that such acts of the defendant were unlawful. It argues that since the court of chancery has taken jurisdiction of the case it should determine the rights of the parties, and the plaintiff should not be relegated to the law court for relief on the ground of interruption of drainage or seepage or be compelled to bring another bill; that since the findings are legally sufficient to hold that plaintiff's damages were caused by unlawful acts of the defendant which obstruct the drainage of the ground water from its land, the case should be remanded with leave to the plaintiff to amend its bill by adding allegations to that effect, and with leave to take further evidence on the question of plaintiff's damages, etc. The plaintiff invokes the well-settled rule in this jurisdiction that a plaintiff may have relief in a court of equity where the facts found present a case entitling him thereto, although the bill alleges a different right than that shown by the findings; but he must ask to amend the bill, for he cannot recover on a case not made thereby. *Hitchcock* v. *Kennison,* 95 Vt. 327, 334, 115 Atl. 156; *Jones, Admx.* v. *Williams,* 94 Vt. 175, 178, 109 Atl. 803; *North Troy Graded School District* v. *Town of Troy,* 80 Vt. 16, 33, 66 Atl. 1033; *Olmstead* v. *Abbott,* 61 Vt. 281, 290, 18 Atl. 315.

The defendant, in reply to this argument, says that if the decree should be reversed and the case remanded for amend-

ment of the bill and for further findings, as requested by the plaintiff, it would not avail the plaintiff because in this jurisdiction the plaintiff cannot recover damages as a matter of law for the interruption or obstruction of the percolation of ground water from its premises; and because the acts of the defendant which resulted in obstructing the percolation of such water were not unlawful.

Before considering this question, we call attention to the principal relief sought by the plaintiff, and the grounds on which it claims the court of chancery has jurisdiction. The plaintiff has briefed and argued its case on the theory that the main question is its right to recover damages. This theory is erroneous. The principal relief which the plaintiff seeks is a permanent injunction restraining the defendant from further maintaining and operating its dam and flashboards thereon in manner so as to cause damage to the plaintiff's premises, buildings and business. It alleges that the unlawful acts of the defendant, of which it complains, constitute ''a continuing trespass,'' and that the court of chancery has jurisdiction to enjoin the same to prevent such trespass from ripening into an easement to the defendant and to prevent a multiplicity of suits. It follows that the right of the plaintiff to an accounting of damages depends upon its making a case entitling it to injunctive relief, and if it fails in the latter respect, it also fails to establish a right to recover damages in this suit.

The plaintiff says that the right it claims in the bill ''is to have its premises free from water caused by the unlawful acts of the defendant''; so the inquiry is whether the interruption or obstruction of the percolation of the ground water in plaintiff's land from such land by the dikes and the ponded water of the river are unlawful acts of the defendant which entitle the plaintiff to injunctive relief.

The law of percolating waters is well established in this jurisdiction. Our rule is the rule of the common law as laid down in the leading case of *Acton* v. *Blundell*, 12 M. & W. 324. Such water is regarded as part of the land itself, and it belongs to the owner of the land as much as the land itself or the rocks and stones in it. There are no correlative rights between the owners of adjoining lands in reference to the use of such water; and the law governing the use of the water of streams flowing on the surface is not applicable. The owner of the soil may

use it on his own land as he pleases or he may sell it to be used by others elsewhere although it deprives adjoining land owners of its use, or he may construct barriers which prevent such water from seeping into his soil or cause it to seep into the soil of another. The law refuses to recognize the existence of correlative rights in such water as between landowners, for the reason that the laws which govern its presence and movement are so secret, uncertain, and uncontrollable that a general regulation of the subject is impracticable. This rule was first adopted in this jurisdiction in *Chatfield* v. *Wilson,* 28 Vt. 49. It was approved when that case was before this Court after retrial, *Id.,* 31 Vt. 358, and it has been followed in *Harwood* v. *Benton & Jones,* 32 Vt. 724, 736; *Clark* v. *Estate of Conroe,* 38 Vt. 469, 474; *Minard* v. *Currier,* 67 Vt. 489, 492, 32 Atl. 472; *Wheelock* v. *Jacobs,* 70 Vt. 162, 40 Atl. 41, 43 L. R. A. 105, 67 A. S. R. 659; and *Fire District* v. *Graniteville Spring Water Co.,* 103 Vt. 89, 159 Atl. 42.

The plaintiff relies upon *Bassett* v. *Salisbury Mfg. Co.,* 43 N. H. 569, 82 A. D. 179, as supporting its contention that the acts of the defendant were unlawful. The court there held that the general rule governing the use of water flowing on the surface in well-defined streams or channels governs the use of percolating water. The court refused to follow the rule adopted in *Acton* v. *Blundell, supra,* and *Chatfield* v. *Wilson, supra,* which were cited and relied upon by the defendant. But the law of that case, which has been followed in later New Hampshire cases, is not the law in this jurisdiction.

The plaintiff also relies upon *Pixley* v. *Clark,* 35 N. Y. 520, 91 A. D. 72. That was an action for flooding plaintiff's land. It was held that the owner of a dam who raised the water of a stream above its natural banks, although he prevented its overflow by embankments, was liable if, in consequence of his action, the ponded water of the stream percolated through the natural banks and his land so as to drown the adjoining land of the plaintiff.

The plaintiff argues that, by parity of reasoning, the defendant cannot erect dikes or raise the water in the river and prevent the percolating of water from plaintiff's premises into the river and escape liability for the damages caused thereby. The court held in that case that the law of the use of surface streams governed, and not that of percolating waters; that it mattered

not whether the damage was occasioned by the *overflow of,* or the *percolating through,* the natural banks, so long as the result was occasioned by an improper interference with the natural flow of the stream. The court, when disposing of the defendant's claim that the case was governed by the law of percolating waters, said: ''An owner of the soil may divert percolating water, consume or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of the land is the absolute owner of the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with, or destroying, percolating or circulating water under the earth's surface. But the difficulty is, the defendants are not sued for interfering with or cutting off percolating water.'' The plaintiff has cited other cases which we do not discuss because they do not involve the law of percolating waters, but the rights of riparian owners for the flooding of their lands.

The defendant claims that *Harwood* v. *Benton & Jones,* 32 Vt. 724, is controlling on the facts in this case. That was an action of case for obstructing a stream with a dam and thereby causing water to flow upon the garden and into the cellar of the plaintiff. The defendants owned a mill and an artificial pond caused by their dam west of a road. On the east side of the road was the plaintiff's land, no part of which was bounded upon the pond. The plaintiff based his right to recover upon two grounds: (1) That the dam was maintained at an unlawful height which caused the waters of the pond to overflow his land; (2) that such ponded waters obstructed the natural percolation of underground water from his land and caused it to gush out upon, or percolate through and stand upon his land and in his cellar, to his injury.

This Court said, as to the first ground of recovery: ''So far as flowing surface water was concerned, the plaintiff could not call in question the right of the defendants to keep their dam of any height they chose, provided it did not cause the water to flow upon or soak into his land. He was not bounded upon the stream, and so was not a *riparian* owner. He could not question the defendant's right to overflow the whole surface up to his line, and in this respect it could be no element in his case whether the defendant's pond had been raised higher since 1853 than it had been by previous uses. It could do him

no injury, unless it should cause the water to come upon or soak into his land."

The court below charged the jury on the second ground of recovery, that if the defendants had raised their pond since 1853 higher than they had the right to do, and thereby had obstructed the underground water from passing off as formerly, "and had caused it to gush out upon, or percolate through, and stand upon the plaintiff's land and in his cellar to his injury, then the defendants were liable." This Court, when holding that this part of the charge was error, said: "This question excludes the idea that, as against the plaintiff, the defendants have transcended their right in respect to the surface water, or infringed any right of the plaintiff in regard to it. For the purposes of this question, the case stands much the same as if the defendants, upon the western margin of the road adjacent to the plaintiff's premises, but upon their own land, had sunk and constructed an impervious wall, and thereby, in the language of the charge, 'obstructed the water in subterranean streams from passing off as formerly, and had caused it to gush out upon, and percolate through, and stand upon the plaintiff's land and in his cellar, to his injury.' Can it make any difference how this effect upon the underground streams is produced, whether by a bank of stones upon the defendant's land or a bank of water? Have not the defendants as good a right to pile up the one as the other? It would seem difficult to assign a reason why not." After discussing *Chatfield* v. *Wilson, supra,* and the law of percolating waters adopted in that case, the Court said further: "Treating that case as a sound exposition and application of the law, must it not be decisive of the question now in hand? It will be noted that in the present case the complaint is not that the water * * * percolated or soaked into the land and cellar of the plaintiff, but that it obstructed the flow of underground streams from the plaintiff's land, and it was to this specific fact and feature of the case that this part of the charge was directed. No reason occurs to us why a party should be liable for the result of the acts upon his own land which impede the flowing of underground currents from the land of an adjoining owner, thus producing injury, when it is conceded that he would not be liable for acts that would produce injury by preventing the flow of such currents into the territory of such adjoining owner; why it is less lawful for my neighbor to drain my well by dig-

ging one near mine, on his own soil, than to flood my cellar by the construction of a wall or other impediment that prevents the flow of water under ground from my premises.''

We have given special consideration to *Harwood* v. *Benton & Jones* because what we have said of the issues in that case and have quoted from the opinion of the Court answer the plaintiff's claims that the right of the defendants in that case to interfere with the percolation of underground water from the plaintiff's land was not in issue; that what the Court said of the law of percolating waters is mere dictum; that the case was not thoroughly considered in applying the doctrine of *Chatfield* v. *Wilson;* and that the facts in that case are not comparable to the facts in the instant case.

The plaintiff argues that it and the defendant are not adjoining landowners, and that the defendant owns no land between plaintiff's land and the river. It also says that its lands are under no servitude to the defendant; that the defendant's rights as to damming the river and raising the water are restricted to charter rights; and that the defendant is not a landowner in the sense that the word is used in *Harwood* v. *Benton & Jones, supra.*

██ It is true that the defendant is restricted to its charter rights; but it is given the charter right in Vermont ''to hold the flow of said river in storage, as may be necessary for the reasonable development and use of such water power.'' Acts of 1906, No. 340, § 7. The chancellor found that the height of the dam, including flashboards, does not exceed the restrictions of the charters in that respect; and he also found that the defendant ''has exercised reasonable care and prudence in the operation of its dam, including flashboards, at all times involved in the issues in this case.'' We cannot presume, in the face of these findings, that the defendant has exceeded its charter rights in the erection and maintenance of its dam and in holding the flow of the river in storage.

██ ██ It appears that the dikes were erected in part within certain flowage rights which the defendant purchased from riparian owners and in part on other property which it was permitted to use for that purpose. As to the flowage rights, the defendant, as against the plaintiff, will be considered as the owner of the land. *Lawrie* v. *Silsby,* 76 Vt. 240, 252, 56 Atl. 1106, 104 A. S. R. 927. As to the lands on which the defend-

ant had permission to erect the dikes, the owners of the same had the legal right to construct barriers on their lands which would obstruct the percolation of the ground water from the plaintiff's premises, without being liable for any damage caused thereby; and that right might be assigned to the defendant either by grant or license.

The rights of the parties as to the ground water are governed by the law of percolating waters as adopted in *Chatfield* v. *Wilson* and applied in *Harwood* v. *Benton & Jones* and the other later cases in this jurisdiction. The acts of the defendant which interfere with or obstruct the percolation of ground water from the plaintiff's land were not unlawful acts; and the plaintiff is not entitled to injunctive relief on that ground.

The plaintiff also contends that there is a contractual liability on the part of the defendant to make good all damage suffered by the plaintiff by reason of the erection of the dam.

There is an allegation in the bill that in the early part of 1909, when its premises were affected and flooded by the raising of the waters of the river, the plaintiff requested the defendant to state what its position would be with reference thereto, and "said defendant thereupon assured the plaintiff, in substance, that it would be responsible to the plaintiff for any and all damages to plaintiff's land, property and business rising from the building and maintenance of said dam and would at all times protect the plaintiff's property from any damage accruing from the overflowing of the Connecticut River." This allegation is denied by the defendant.

The plaintiff says that evidence was received in support of this allegation upon which a finding could have been made. The chancellor did not make any finding on the subject-matter of the allegation. The record fails to show any request by the plaintiff for findings or an exception to the chancellor's failure to make a finding; therefore there is nothing for this Court to review.

The plaintiff says that "on a remand of the case, the chancellor should be directed to make a finding with reference to such agreement, and, if the pleading in such agreement is not sufficient, plaintiff should have leave to amend the allegation in that respect; and the plaintiff should further have leave to plead the same facts as a ground of estoppel to the defendant

denying liability for damage done to the plaintiff by reason of the erection of said dam, flashboard, dikes,'' etc.

In the circumstances of the case, we do not, on remand, direct the chancellor to make a finding, as requested; nor is it necessary to grant leave to the plaintiff to amend its pleadings. When the contentions of the parties are not passed upon by this Court, and the remand is not accompanied by a mandate restricting the action of the chancellor, the matter of new or amended pleadings is left with the court of chancery or a chancellor by the provisions of G. L. 1571. *Tudor* v. *Kennett*, 88 Vt. 291, 92 Atl. 213.

The plaintiff contends further that the defendant is under a charter obligation to pay all damage suffered by it which is caused by the defendant's interference with the percolation of the ground water from its premises.

The chancellor found in finding No. 3, that the Connecticut River Power Company, one of the constituent corporations forming the defendant, is a Vermont corporation incorporated under the provisions of Act 201, Laws of 1902, as amended by Act 209, Laws of 1904, and Act 340, Laws of 1906.' This finding also names the Acts of the Legislature of New Hampshire under which the Connecticut River Power Company of New Hampshire, the other constituent corporation, was incorporated.

The chancellor found in finding No. 43 that section 4 of the Vermont Charter of the Connecticut River Power Company, Act 201, Laws of 1902, as amended by Act 209, Laws of 1904, provided for the taking of land and property by eminent domain proceedings and referred the proceedings to Chapter 169 of Vermont Statutes relating to the appraisal of damages in case of a railroad corporation taking land or property; that the material part of section 4 is as follows:

''If in the erection, maintenance and continuance of said dam, * * * it becomes necessary to take land of any other person or persons or corporations, or to flow water onto or otherwise damage the land or property of any other person or persons or corporation, and this corporation cannot agree with the owner. * * * And upon payment or tender of the damage and costs so ascertained and determined, this corporation may proceed to take such lands or to flow water upon or otherwise do damage to said land and property. * * * ''

The New Hampshire charter provides the same in substance.

The plaintiff contends that the phrases ''or otherwise damage,'' and ''or otherwise do damage,'' as used in connection with the necessity for taking and overflowing land in the erection, maintenance, and continuance of defendant's dam, include damage sustained by it which is caused by interference with the percolating water in its land. The defendant denies that section 4 should be given this construction.

The plaintiff excepted to that part of finding No. 8 which is quoted on page 5 of this opinion on the ground that ''the defendant was without right to flow water onto *or otherwise damage* the land or property of the plaintiff until after it had complied with the terms of its charters, both New Hampshire and Vermont; that there is no evidence in the case that the defendant has complied with this provision of its charters.''

This exception necessarily raises the question whether the damage caused by the interference with the percolating water in plaintiff's land is included in the quoted phrases to which we have just referred, as such damage is the only *other damage* claimed to have been suffered by the plaintiff. But, as this exception has not been briefed by the plaintiff, it is waived, and the question is not before this Court for consideration.

This disposes of all the questions briefed by the plaintiff.

*Decree affirmed, and cause remanded.*