Windsor,
February,
1837. LYMAN MOWER and R. D. GRANGER *v.* TITUS HUTCHINSON.

*(In Chancery.)*

R., being the owner of a farm and a fall of water, conveys by deed all the land, which shall be subject to be covered by water, in consequence of a dam six feet high from low water mark, between Sept. and May ; and in a subsequent deed conveys, with a like description, excepting the lands of B. and J. :   *Held,* that the deed conveyed a right to flow all the grantor's land by such dam :   That the dam might be raised six feet from the bed of the stream as it was when the deed was executed.

M., who was the owner of works on the dam, together with H , purchased the farm which was owned by R., and agreed upon a division, but the deed was taken to them jointly, and they released, each to the other, their respective portions of the farm, agreeably to the division :   *Held,* that the release from M. to H. conveyed the right which he had, as owner of the works, to flow the land thus released ; but that it was inequitable that it should so operate, and that H. should be enjoined from giving the lease in evidence, as conveying the right, which M. had to flow the lands.

A right to flow, derived from grant, is not lost by *non user,* when it cannot be used without disturbing the right of others, but may be exercised whenever the right of the others can be extinguished or bought,

The bill, in this case, sets forth, that Mower, one of the orators, on the 3d day of June, 1819, was the owner of an oil mill, on the South branch of Queeche river, in Woodstock, and, as appurtenant thereto, of a right of flowing a portion of the easterly part of a farm, called the Briggs farm, through which said branch ran, and that the defendant had knowledge of such ownership ; that, on that day, Mower and defendant agreed to purchase the Briggs farm, upon an understanding to divide the farm between them ; Mower to have the part West of the road leading to the South village in Woodstock, and defendant to have the part East of that road ;—that they agreed to take separate deeds, each taking a deed of the portions above stated, and that they regarded the transaction as a separate purchase, in fact, of said portions ; but that, the grantor declining to give separate deeds, they concluded to take a joint deed, and afterwards divide the farm, by mutual quit-claims, in the manner previously agreed upon ;—that each paid, or secured to be paid, his portion of the purchase money, according to his share of the farm, and that, afterwards, on the 1st day of April, 1820, they executed the quit claim deeds, in pursuance of ther previous agreement, the deeds containing a nominal consideration only, none, in fact, having been paid by either party.   The bill further stated that

the said deeds were intended only to operate as a partition between Mower and the defendant, of the title derived from their joint grantor, and that Mower neither intended to convey nor impair, nor did the defendant intend to purchase, the right of flowing the land on Mower's part of the farm ; that the subject of said flowing was neither discussed nor thought of by them, and that, if the deed from Mower to defendant conveyed or impaired said right, it was wholly a mistake of the parties.

Windsor,
February,
1837.

Mower and
Granger
v.
Hutchinson.

The bill also set forth, that Mower, on the 10th December, 1829, conveyed the mill and said right of flowing to the orator, Granger, by deed of warranty, and that said Granger entered upon the premises, made improvements thereon, and occupied and used the said right of flowing ; and that defendant, at the December term of of Windsor county court, 1833, instituted an action against Granger, for flowing defendant's land, and, on the trial of said action, at the May term, 1834, gave in evidence, altho' objected to, the quit-claim deed from Mower to him, as conveying or extinguishing said right of flowing, and, upon that evidence, obtained a verdict againstGranger for damages,and that said action was reviewed by Granger, and was still pending in said county court.

The bill also alleged that Mower acquired the right of flowing said land, by deed, dated 21st May, 1802, from Stephen Powers, who then owned said Briggs farm, to Elkanah Phelps, and by a chain of mesne conveyances, from said Phelps to Mower, all of which deeds were duly recorded before the 3d day of June, 1819.

There were other facts stated in the bill, which will appear in the opinion of of the court. The prayer of the bill was, that the defendant might " be perpetually enjoined to refrain, in any future trial, which may be had in said cause, and in any action hereafter commenced, from offering or relying upon the said quit-claim deed from the said Mower, as releasing, extinguishing or in any way affecting or impairing the said right of flowage, and be decreed to release to the orators, or one of them, all right or title to the said right of flowage, by virtue of the said deed of quit-claim from the said Mower, and all power and authority or right, in any way, to impair or impede the exercise or enjoyment of the same, and be enjoined from further prosecuting the said action in the county court."

The answer of the defendant denied all knowledge or belief that Mower ever had or exercised, or pretended to exercise any

Windsor
February,
1837.

Mower and
Granger
v.
Hutchinson.

right of flowage, such as was alleged in the bill, at any time, excepting between the first day of September and the first day of the next succeeding May, annually, and alleged that the defendant had always understood that Mower's right of flowing, within those months, was limited to such extent, as would be produced by a dam six feet high, above low water mark; but that the present dam is seven and an half feet high above the aproning below the dam, and nine feet above the surface of the water below the dam, at low water. The answer admitted that Jireh Swift, the immediate grantor of Mower and the defendant, was, on the 3d June, 1819, seized, in fee, of the Briggs farm, and that whatever right of flowing then existed, extended to that part of the farm, lying on the East side of the road mentioned in the orators' bill. It also admitted that they agreed to purchase the farm together and divide it by the said road, but alleged that the conveyance was taken to them jointly, because they had not, at the date of the deed, agreed which of them should take the tavern house on a part of said farm. It further admitted that they, each, gave separate notes and security for their respective portions of the purchase money; that the quit-claim deeds between Mower and the defendant were executed in the manner and for the consideration, stated in the orators' bill, but denied that the defendant, up to, or at the time of executing said deed, ever suspected or heard from Mower, or any other person, that Mower had or pretended to have any right to keep up the pond, at all, between the 1st of May and the 1st of September, in each year. The answer further alleged that the defendant always believed and still believed that Mower, while he owned the mill, never did attempt to keep up the water in the pond, or use it in operating the mill between the 1st of May and the 1st of September, except, possibly, for a day or two, after the 1st of May, to finish the work on hand in the mill, and that defendant, had he known of any such claim of flowing the farm, as is now asserted, would either have refused to purchase, at any price, or except at a much less price than he paid for it. With regard to the deed from Powers to Phelps and the chain of deeds to Mower, the defendant answered, that he had no motive for searching the records, to ascertain whether they were recorded. And the defendant insisted that such deeds conveyed to the orators no such right, as they claimed, of flowing the land in question, and that if they ever did give such right, it had been

lost by *non user;* and that, at all events, such right was convey- Windsor, *Febuary,* 1837. ed by Mower to defendant, and the right of the former to complain was forfeited by his neglect to notify defendant of his said Mower and Granger *v.* Hutchinson. right.

At the time of receiving the deed of the Briggs farm, to wit, on the 3d of June, 1819, Mower and defendant executed the following agreement, viz :—

" Whereas, Lyman Mower and Titus Hutchinson have this " day bought of Jireh Swift the. Briggs' farm, so called, now oc- " cupied by John Pratt, for which we are to give three thou- " sand dollars, and pay a sixth part on the 1st of April next, and " give security · for other five yearly payments, on interest " from that time ; now we hereby mutually agree with each oth- " er that said Hutchinson shall quit to said Mower that part of " said farm, which lies on the West side of the highway, leading " South through said farm, and said Mower is to give twenty " dollars an acre for the same, and pay the same proportionably " on said payments to said Swift ;—and that said Mower shall " quit to said Hutchinson the remainder of said farm, and the " said Hutchinson to pay to said Swift the remainder of said " purchase money after deducting said sum so to be paid by said " Mower, as aforesaid.

June 3d, 1819.

(Signed,)          TITUS HUTCHINSON.          (Seal.)
(Signed,)          LYMAN MOWER."          (Seal.)

Such other facts, shewn on the hearing, as are material in the case, will sufficiently appear in the opinion of the court delivered by

WILLIAMS, CHANCELLOR.—It has been considered, by both parties, necessary to inquire, as to the existence and extent of the right, claimed by the orators, to keep up a dam and thereby overflow the lands of the defendant. The answer of the defendant admits, or rather recognizes a right, in the complainants, to keep up the water to some extent, except between the first day of May and the first day of the succeeding September, annually, but does not admit any right, or that the defendant had any knowledge of any claim of the complainants, as set forth in the bill. From the papers in evidence, it appears, that on the 11th of May, 1792, Jason Richardson, who then owned the premises, now owned by both parties to this bill, executed a deed to James Wilder of about one quarter of an acre of land, and at the same

Windsor.
February,
1837.

Mower and
Granger
v.
Hutchinson.

time executed a lease, which is in the words. following : " all " those lands lying upon Queeche South branch, which shall be " subject to be covered by water, upon (by) virtue of a dam " being erected six feet in height from low water mark, on about " one . quarter of an acre of land, lying on said stream, the " southerly side of the road that leads from the court house to- " wards Hartland, which I have conveyed by deed to the said " Wilder, bearing date with these presents.    The said Wilder " to have the privilege of covering all that land by water, south- " erly from said quarter of an acre, upon the stream, for the " space of about fifty nine rods and a half to the height of a ledge " of rocks, which is reputed the lower end of the upper mea- " dow, reference being had to the six feet height of dam being " made on said quarter of an acre."    To this lease there was a provision that the water be drawn or drained off yearly, and every year, from the first day of May until the first day of September.    In April, 1800, Richardson conveyed a tract of land, bordering on this stream of water, to Nicholas Baylies. The title to this lot was conveyed by  Baylies to Charles Marsh, in  November, 1809 ; by Marsh to Norman Williams in November, 1810 ; by Williams to Sylvester Edson, in April, 1825.    Edson, in November, 1828, conveyed to Fisher & M'-Laughlin, a blacksmith's shop and certain water privileges in this dam.    By the conveyance from Richardson to Baylies, the latter owned the land conveyed, subject only to such inconven-iences or incumbrances as was created by the lease from Rich-ardson to Wilder in 1792.    From the testimony it appears, that when the water is raised by a dam, as now claimed by the ora-tors, it is and always has been injurious to the land conveyed to Baylies.

It appears, that Jason Richardson, in March, 1807, conveyed the land owned by him, and which is the same land now owned by the defendant and complainant, to Stephen Powers.    On the 21st of May, 1802, James Wilder conveyed all his interest in the works on the dam to Elkanah Phelps ; and, on the same day, Stephen Powers executed a deed to Phelps.    On the con-struction of this last deed, a question has been made.    It is in the words following, to wit :  " a piece or parcel of land lying on the " South branch of Water Queeche river, so called, and, for a des- " cription, it being all that land, excepting the land belonging  to " Nicholas Baylies and Benjamin Swan, which is covered by the

" waters of the said south branch overflowing the dam of said
" Wilder's oil mill, on said branch, which dam is raised six feet
" above low water mark ; however, all those lands covered by
" said water, and are connected with the main body of wa-
" ter by small outlets, are not conveyed ; containing four
" acres more or less." In the deed there was an agreement on
the part of Phelps, " that at any time, between the first of May
" and the last day of August, when the waters exceed four inches
in height, above the top of said dam, the waters may be, by
hoisting the gates, lowered to that height, and the said Phelps
" will so lower said waters, if they may be, by hoisting said
" gates." There was also added, after the execution of the
deed, an agreement in the words following. " It is agreed that
" the said Phelps shall have the privilege of overflowing the
" lands, in consequence of raising the dam at the height within
" mentioned, without being liable to me, my heirs, or assigns,
" for any damages, whether the same is conveyed by this instru-
ment, or not"—Signed by Powers and witnessed by Baylies, one
of the witnesses to the deed. Although this addition is not
sealed, and has only one attesting witness, it appears to have
been recorded with the deed. The defendant contends, that
this latter agreement can have no operation against the after
purchasers from Powers ; that it is not a subject matter of re-
cord ; and no person is under obligation to notice it. Though
I entertain a different opinion, and consider it a part of the deed,
or a part of the description of the thing granted, and, of necessi-
ty, is to control the construction of the deed ; yet, a decision of
the point is not necessary ; for we consider, that the deed, without
the addition, as well as the one of 1792, did convey a right to
flow all the lands of the grantor, by a dam six feet high, except
as against the owners of the land belonging to Baylies and
Swan ; and whenever the owners of these lands could be quiet-
ed, the grantee, Phelps, had the right to keep up a dam six feet
high, subject only to the condition or agreement contained in
the deed to him before cited. The written agreement, which
was signed by the grantor, Powers, shews most consclusively
that such was his understanding, and was probably added by
the gentleman, who witnessed the deed and agreement, to guard
against any misconception, and to make that more certain, which,
we think, is sufficiently certain without it.

Upon a recurrence to the testimony, we find that it was so

Windsor,
February,
1837.

Mower and
Granger
v.
Hutchinson.

considered by those, who were interested in the works, situated at the dam, as well as by those, who owned the farm or land, first owned by Richardson, that sometimes with, and sometimes without the consent of the owners of the Baylies' place, the dam has been kept up, the lands overflowed, and none, but the owners of that place, have ever interfered.

The right or privilege, which was thus conveyed to Phelps, it appears, has come to the present orators by a regular chain of conveyances; and it also appears in testimony, that the farm was conveyed by Powers to John Briggs, in April, 1808; that the administrators of Briggs conveyed to Jireh Swift in February, 1814; that in June, 1819, the complainant, Mower, and the defendant purchased the same farm and took a deed to themselves jointly; and that in April, 1820, they mutually conveyed to each other the several parts of the farm, by them respectively purchased of Swift, agreeably to the original agreement. The several deeds from Powers, Briggs' administrators, and Swift, were deeds of warranty, containing the usual covenants against incumbrances.

It is, however, further urged in this case, that if there was any right thus granted to Phelps, the orators can claim no benefit from it, inasmuch as it has been lost, and the defendant and the owners of the farm have occupied it, without any inconvenience from the dam, for a long series of years. We think, however, there can be no foundation for the allegation that the orators have lost any right. The right arises from grant, and not from prescription, and if the orators could not avail themselves of it, to its full extent, without encroaching upon those, who occupied the Baylies place, and although it should have been dormant, in consequence of that, for any number of years; yet, they might use it against all others, and, whenever the right of the owners of the Baylies place could be purchased, or extinguished, or quieted, might use it without any interruption. Nothing would be lost by the interruption, or *non* use, in consequence of the claim of those, who owned the lot, originally purchased by Baylies. It appears abundantly from the testimony, that the grantees of Phelps and others, owning works on this dam, have, at various times, kept it up and flowed the lands, now owned by the defendant, in the summer season; and that the inteference of Williams, who owned the Baylies place, was fre-

quently sought and obtained, by the persons who owned the farm affected by this overflowing of the water.

Windsor,
February,
1837.

Mower and
Granger.
v.
Hutchinson.

As the orators have the right, of which we have spoken, by grant, and that grant is on record, the defendant is deemed, in law, to have notice of the same. All persons are considered as having notice of all the conveyances, on record, connected with their title. The deed from Richardson to Wilder, as well as the deed from Powers to Phelps, gave the right to erect a dam six feet high, and also to flow all the lands owned by the grantors, by raising the pond, which such a dam would raise, and created an incumbrance on those lands, and was similar to a grant of a right of way, or any other *easement* on the land. The grant was, therefore, of a part and parcel of the farm, which Powers owned, and which was afterwards purchased by the defendant and the complainant, Mower, and being on record, neither of them can now claim that they are purchasers without notice. This renders it unnecessary for us to attend to that part of the testimony, introduced to shew that the claim, or right in the owners of the dam, was a matter of public notoriety, known to the owners and occupants of the farm, and also to the present defendant.

We have thus examined and considered the proof, as to the existence of the right claimed by the orators, and the result of our inquiries is, as has been already expressed, inasmuch as both parties have considered the cause as depending, in a great measure, upon the result to which we might come, on this part of the case. It may be doubtful, however, whether any thing further was required, than to find that the complainants have claimed such a right; as the principal inquiry is, what is the effect of the deed executed by Mower to the defendant, in April, 1820. Mower was, at that time, the owner of the oil mill, situated on the dam, and, with the owners of the other privileges on the dam, had the right of raising the dam and flowing the lands, which have already been considered. The defendant claims, both in his suit at law, and here, that the effect of the deed from Mower to him was to convey the land to him free from any incumbrances, and to extinguish any right which he, Mower, had, at that time, under the grant to Phelps, before mentioned; and the question now is, whether it is consistent with equity, that he should thus use this deed. It is not pretended in the answer, that any thing was paid to Mower for a grant of this

Windsor,
February,
1837.

Mower and
Granger
o.
Hutchinson.

right. The written agreement made between them was, that each should quit-claim to the other the parts of the farm deeded to them, which they had respectively agreed to take. Mower was to give twenty dollars an acre for that part of the farm, which he was to have, lying West of the road, and pay, in that proportion, on the notes executed for the purchase money, and the defendant to pay the residue. An after measurement was necessary to ascertain this proportion. This measurement was made, and they gave their notes for the proportion each was to pay, and executed the quit-claim deeds between themselves. It appears from their writing, that they had agreed upon the division of the farm, at the time of taking the deed, and Lyman, one of the witnesses, says, that they requested separate deeds, but he, as attorney of Swift, refused to comply with their request. As these quit-claim deeds, between Mower, the complainant, and the defendant, were executed in pursuance of the contract, and no consideration, therefore, passed from one to the other, they ought not to have any further operation than was contemplated by the parties;—that is, a partition between themselves. If Mower conveyed any other interest, than was conveyed to him, by the deed from Swift, it was evidently not so intended, and ought not so to operate. Both parties to this controversy had, in law, notice of the deeds previously executed by Richardson and Powers;—they may have labored under a mistake, as to the effects of their respective deeds;—the question, now in controversy, as to the right of flowing the land, may not have entered into their consideration, either because it was a matter of notoriety, or because it was not considered as creating any serious incumbrance. But neither should now claim any thing more than was then contemplated. If any claim on Swift, arising from his covenant against incumbrances, is lost, in consequence of the deed having been executed to the defendant and Mower, (on which, however, we have not formed any opinion,) it is a misfortune, which the parties must bear, and which they should have duly considered, when the deed was taken. It cannot justify the defendant in making any further use of the quit-claim deed, than was intended by the parties.

We have not taken into consideration, whether the present dam is either higher or lower than it ought to be by the grant. The dam may be erected as high as it was to be by the deeds of Richardson and Powers, that is, six feet above low water, as

the current then was, and they are not confined to six feet only, from the bottom of the river, as it may be, or may have been lowered, from time to time, by freshets or blasting rocks. The parties can establish their rights, in the suit at law; the orators may avail themselves of the grants, made in 1792 and 1802, by Richardson and Powers. If they have exceeded those, they are still liable at law. Our decision is only to this effect, that the quit-claim deed, executed by Mower, shall not affect those rights, any further than if Swift had directly conveyed to the defendant the part, which was quit-claimed to him by Mower. The orators, therefore, will be entitled to a decree, enjoining the defendant, at all times hereafter, in any future trial, which may be had, of the cause now pending in the county court, in favor of the defendant, Hutchinson, against the complainant, Granger, or in any action hereafter to be commenced, from offering, or relying on the said quit-claim deed from Mower, as releasing, extinguishing, or in any way affecting or impairing, the right which he, Mower, had, at the date of the deed, to flow the lands therein conveyed; but are not entitled to cost, as they seek to be relieved against a mistake of Mower, as well as of the defendant.

*Marsh & Williams, for the complainants.*

*Hutchinson, pro se.*