NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 117

No. 2016-061

| | |
|---|---|
| TransCanada Hydro Northeast, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orange Unit, |
| | Civil Division |
| | |
| Town of Newbury, | January Term, 2017 |
| State of Vermont | |

Michael Pratt, Acting, J., Specially Assigned

Robert E. Woolmington of Witten, Woolmington, Campbell & Bernal, P.C., Manchester Center, for Plaintiff-Appellant.

William H. Sorrell, Attorney General, William E. Griffin, Chief Assistant Attorney General, and Mary L. Bachman, Assistant Attorney General, Montpelier, for Defendant-Appellee State.

Jon T. Anderson of Burak Anderson & Melloni, PLC, Burlington, for Defendant-Appellee Town of Newbury.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **DOOLEY, J.** Taxpayer TransCanada Hydro appeals a decision of the Orange County Superior Court valuing flow easements that taxpayer owns over land in the Town of Newbury at $1,532,211 for property tax purposes. Taxpayer owns and operates the Wilder Dam on the Connecticut River in Hartford, Vermont, downstream from Newbury, and the flow easements give taxpayer the right to flood land abutting the river in Newbury. As discussed in the

body of the opinion, taxpayer challenges the valuation as unsupported by the admissible evidence and the court's reasoning.  We affirm.

¶ 2.    The Connecticut River, which flows from north to south, forms the boundary between the State of Vermont and the State of New Hampshire.  The Wilder Dam rises above the river holding back water to a height of 385 feet above sea level.[1]  Its presence affects the amount of flooding of upstream land abutting the river at least with respect to land at or below the level of the top of the dam.  See Petition of Citizens Utilities Co., 117 Vt. 285, 289, 91 A.2d 687, 691 (1952) ("When a dam is erected across a river it sets the water back against the upstream river banks and over them to at least the level that the surface of the water is maintained at the dam.").  At least some of the abutting land in Newbury is below the level of the dam even though the southern boundary of the Town is forty-three miles upstream of the dam and the Town extends eight miles up the river.

¶ 3.    Erection of a dam such as to cause intentional flooding of the upstream land abutting the river is a trespass.  See Restatement (Second) of Torts § 158 cmt. i, illus. 5 (1965).  In essence, a flow easement is a right to commit that trespass, transforming an entry that would otherwise be a trespass for which the entrant was liable into a permitted entry for which the entrant bears no liability as long as the terms of the easement are not exceeded.  See White River Chair Co. v. Conn. River Power Co., 105 Vt. 24, 52, 162 A. 859, 870-71 (1932); Mower v. Hutchinson, 9 Vt. 242, 249 (1837).  It is an interest in real property.  See White River Chair Co., 105 Vt. at 52, 162 A. at 870 ("As to the flowage rights, the defendant, as against the plaintiff, will be considered as the owner of the land."); 32 V.S.A. § 3605 ("The interest of an owner in . . . flowage rights . . . shall be appraised and set in the grand list as real estate to the owner of such rights.").

---

[1]  This height is imposed by the Federal Energy Regulatory Commission (FERC) license.

¶ 4. The flow easements being valued in this case were deeded to taxpayer's predecessor by the landowners in 1949 and 1950 when the Wilder Dam was being built. The typical flow easement deed provides:

> I . . . do give, grant, bargain, sell and convey unto said New England Power Company . . . the perpetual right and easement to flow and other-wise damage so much of the hereinafter described land with the buildings and personal property thereon as may be flowed and damaged by reason of the construction, maintenance and operation (as hereinafter provided) of the dam of the Grantee across the Connecticut River between the towns of Hartford, . . . Vermont and Lebanon, . . . New Hampshire . . . ; the elevation of the spill-way section of such dam . . . not to exceed an assumed elevation of 385 feet . . . ; said dam and its appurtenant facilities to be so constructed and operated that the elevation of the water of said River at said dam will not exceed Elevation 385 feet when the flow of said River at said dam is 140,000 cubic feet per second or less.

It goes on to say that the lands covered by the easement "are all [of the grantor's] lands bordering on the Connecticut River" in Newbury and describes the lands in relation to prior deeds.

¶ 5. Certain points about the flow easements are important to the resolution of this case. First, the height limit is applicable to the height of the dam and the water contained by the dam and not to the height of the lands subject to the flow easement. Thus, part or all of the subservient lands covered by a particular deed may lie above the level of the dam such that flooding of those lands caused by the dam alone is far less likely. In general, the easement is applicable to all land owned by the grantor and abutting the river and not just that land that was determined to be subject to flooding. Further, the evidence in this case was that the subservient land is productive farmland, and is actively used as such, although spring planting may be delayed by flooding and there is a risk of later destruction of plantings by extreme weather events that could bring flooding at any time. There was also evidence that although the height of the surface of the water behind the dam could not exceed 385 feet, it was actually maintained at a level between 380 and 385 feet and particularly at the former when the flow in the river was high.

3

¶ 6.     Relying upon expert witnesses, the parties used different methodologies to value the flow easements in Newbury.  The following is a simplified description of these methodologies. More detail is provided in the analysis below.

¶ 7.     Taxpayer took the position that the value could not be based on comparable sales of flow easements because no evidence of comparable sales existed, and sale prices are influenced by the right of the dam owner to take such easements by eminent domain.  Instead, taxpayer retained a hydrological firm to model the river flow with and without the Wilder Dam using software that had been approved by FERC for such modeling.  The modeling was done at various flow rates of the river.  At a "normal" flow rate of 10,700 cubic feet per second, the model found that nineteen more acres along the river in Newbury were flooded with the presence of the dam than without the presence of the dam.  It found that at a flow rate between 30,000 and 35,000 cubic feet per second the flooded acreage attributable to the dam reached thirty-three, while three more acres were flooded because of the dam at the hundred-year flood flow rate of 78,197 cubic feet per second.

¶ 8.     Taxpayer also retained an appraisal expert who divided the land along the river into two categories: (1) land that abutted the river up to sixty acres in the Town, called "limited utility" land; and (2) land in the Town further from the river subject to deeded flow easements.  Applying the results of the hydrologist's study, the appraisal expert valued only the land the hydrologist found was flooded solely because of the presence of the dam—all of which was limited utility land—at $500 per acre based on sales of comparable limited utility land along the river.  Because the appraisal expert could not separate the value of the flow easements over that land from the value of the fee interest, he maximized the value of the flow easements by attributing all the sales value to the easements.  Although he looked at comparable values of dams with and without flow

4

easements and land with and without flow easements, the appraisal expert could not derive value from these analyses. Consistent with taxpayer's position that only flow easements over land along the river that was flooded solely because of the dam have value, he valued all the flow easements in the Town at $9500, computed by multiplying the number of acres flooded solely as a result of the dam at the "normal" flow level of the river—nineteen acres—by $500, the value of limited utility land per acre.

¶ 9.    The Town's theory and evidence was very different, arriving at a much larger value. The Town's expert witness, an appraiser specializing in utility property, reviewed the deeds and other documents to determine how much acreage was subject to flow easements and arrived at a coverage area of 1964 acres. Because the easements gave taxpayer the same or similar rights with respect to each acre covered, the Town's expert witness valued each acre the same, irrespective of location or likelihood of flooding. The Town's appraiser found and relied on the per acre price of sales of flow easements in connection with the addition of a pumping station on the Connecticut River in Massachusetts, using them as comparable sales to arrive, with adjustments, at the per acre value of flow easements held by taxpayer at $1100 dollars for a total value of $2,160,000 in Newbury.

¶ 10.    The trial court concluded that the presence of the dam always contributes to some degree, however small, in the duration and depth of flooding so taxpayer is always liable, at least in part, for all flooding. It subtracted out the flooding of any acreage that was outside the hundred-year flood line because it accepted the testimony of taxpayer's hydrology witness that the dam had an insignificant impact on the extent of flooding at that level. The court generally agreed with the approach of the Town's appraiser and valued taxpayer's flow easements based on sales of flow easements. However, it accepted only one of the twenty-six comparables selected by the Town's

5

appraiser, a sale in 1990 of a flow easement over 83.7 acres of land that was priced per acre. It set the per acre value of taxpayer's flow easements at the sales price of that comparable, $836 per acre. It declined to adjust that price for inflation because it was unconvinced that the inflation adjustment methodology of the Town's expert witness, based on the Consumer Price Index, applied to flow easements. It reached a valuation of $1,532,211.

¶ 11. Although the positions of the parties rely on factual differences, they further involve fundamental differences in the applicable law. Two legal issues are central to the resolution of this case: (1) on the record in this case, can flow easements be valued at a uniform per acre rate over all of the land over which taxpayer has an easement, and (2) if so, was the per acre value properly determined based on using a sale of a flow easement in 1990 in a Massachusetts transaction?[2]

---

[2] In addition to taxpayer's challenge to the merits of the trial court decision, taxpayer argues that the court violated 4 V.S.A. § 457 because the assistant judges signed the final decision of the court including the conclusions of law. See id. § 457(b) ("In all proceedings, questions of law shall be decided by the presiding judge. Mixed questions of law and fact shall be deemed to be questions of law. The presiding judge alone shall decide which are questions of law, questions of fact, and mixed questions of law and fact."). Section 457 applies to actions in family court only; however, 4 V.S.A. § 36 includes the same provision. See id. § 36(b) ("In all proceedings, questions of law shall be decided by the presiding judge. . . . Mixed questions of law and fact shall be deemed to be questions of law. The presiding judge alone shall decide which are questions of law, questions of fact, and mixed questions of law and fact."). Both sections also provide that "participation by an assistant judge in a ruling of law shall [not] be grounds for reversal unless a party makes a timely objection and raises the issue on appeal." Id.; id. § 457. The intent of the statute is to give the presiding judge an opportunity to correct a participation error prior to an appeal to this Court. Parties can know there is a participation question only after the decision is issued and, as here, the nature of assistant judge participation is not specified in the decision. Thus, the Legislature must have intended that a party would preserve a claim of participation error by a post-decision motion, giving the trial judge the opportunity to dispel any claim of improper participation if possible. Taxpayer failed to file such a motion or otherwise object to assistant judge participation in the overall decision. Therefore, under the statute, taxpayer may not raise this issue for the first time in this Court.

¶ 12. Before we reach those questions, we lay out the shifting burdens of production and persuasion that apply in property valuation cases, and the standard of review, a subject we return to at the end of this opinion. Whether an appeal is before the state appraiser or, as here the superior court, the case is considered de novo. 32 V.S.A. § 4467. A town has the initial burden of production to produce evidence that the property was appraised at fair market value. In re Bilmar Team Cleaners, 2015 VT 10, ¶ 10, 198 Vt. 330, 114 A.3d 483. Once it has done so, a presumption of validity attaches. Id.; Vanderminden v. Town of Wells, 2013 VT 49, ¶ 8, 194 Vt. 96, 75 A.3d 598. This is a "bursting bubble presumption" that disappears if the taxpayer presents admissible evidence to show that the value exceeds fair market value. Vanderminden, 2013 VT 49, ¶ 8. At that point, the burden of production shifts to a town to show its valuation is correct, but the burden of persuasion always lies with the taxpayer. Id.

¶ 13. On appeal to this Court, the superior court's conclusions will be affirmed if reasonably drawn from the evidence. In re Bilmar Team Cleaners, 2015 VT 10, ¶ 8. As with other types of civil cases, we defer to the superior court's determination of credibility and evidentiary weight and persuasiveness. Id.

¶ 14. We return to the critical questions for this appeal. Taxpayer's first argument is that "[t]he trial court erred in assigning a uniform value to every acre within the 100-year flood plain when the record was undisputed that flowage easements did not affect the fair market value of the underlying fee in virtually all that area." Because the Town and the State have argued that this argument was not preserved, it is important to describe it and its context more specifically. At the start of the trial in this case, the trial judge attempted to define and narrow the issues. He indicated that he understood that the per acre value of the flow easements was uniform across all the acreage covered by the easements. Taxpayer's counsel agreed to this understanding, and the trial judge

used it in putting together his decision. During the trial, the only exception to this understanding was taxpayer's argument that the value of the flow easements over all but the small amount of acreage that could be attributed to the dam was zero; this argument was clearly preserved. The court added a second exception when it held that flow easements over land beyond the 100-year flood line had no value. In its reply brief, taxpayer responded to the nonpreservation argument making clear that it agreed that the per acre value of the flow easements was uniform except where the evidence showed that a particular part of the land was covered by a flow easement that had a value of zero. This position covered both the land beyond the 100-year flood line as the court found and the land beyond the acreage the hydrologist found was flooded as a result of the presence of the dam. With this explanation, we agree that taxpayer's position was preserved and is properly before us.

¶ 15. The uniform value understanding was consistent with the Town's position. It argued that every acre covered by the flow easements should be valued the same based on the testimony of its appraiser. His position was that the value was based on the immunity from suit provided by the flow easements, and that value was uniform across the acreage irrespective of whether the flooding was actually so extensive that it would reach every acre. The Town's appraiser also argued that differences in the value of a flood easement over different acres was approximated by using the median per acre sales price of the comparables, which themselves showed substantial differences in per acre value.

¶ 16. The trial court relied on the testimony of taxpayer's hydrologist but reached a very different conclusion from the hydrologist on the significance of her conclusions. Its rationale was as follows:

8

However, the small number of acres flooded by the dam at any one moment may occur over a very large number of acres. In concept the flooded area caused by the dam is a relatively narrow meandering strip of land along 15 mile stretch of river. As water rises during a flood, there's a small area of flooding at the water's edge caused by the dam's backwater effect. When the natural flooding increases, the area of flooding caused by backwater effect pushes the water's edge out a bit more. When the water's edge naturally recedes, the flooded area due to the dam's backwater effect recedes with it. In sum, the small number of acres is based upon a single moment in time. The large number of acres is the cumulative area affected at every moment from the beginning of a flood event to the end of that flood event.

TransCanada argues that only the small number of acres is important because most of the land would be flooded naturally in any particular flood, except for the small number of acres at the peak water level. For example, TransCanada argues that a crop under 9 feet of water is similarly situated to a crop under 9 feet 1 inch of water, referring to land not at the water's edge. This argument ignores the fact that every acre of land floods a bit sooner because of backwater effect. Similarly, every bit of land stays wet a bit longer as the water recedes. Thus, all land flooded is wet longer because of the Wilder Dam. It's not simply a matter of water depth. The time under water also is enlarged.

Another problem with TransCanada's argument is that each flood event is unique and each flood event may have a different peak level. Even if the court were to consider flooding caused by the dam only at the peak of each flood, two floods could have two very different peaks, and the two narrow strips of land may overlap only partially or not at all. Each subsequent flood may continue to add to the cumulative area flooded by the dam.

The court found, however, that the dam would have no effect on flooding at or beyond the 100-year flood level and subtracted out the acres provided in the deeds that were above the 100-year flood level. Thus, the trial court found that 1859 acres should be considered in valuing the flow easements, 311 acres fewer than provided in the deeds.

¶ 17. While the flow easements are real property, their value lies in the avoidance of liability for the continuing trespass attributable to the dam as it causes water to flow over the river banks and onto the land beyond them. For that trespass, a taxpayer would be liable for any

resulting loss of land value, plus loss of use of the land, however temporary, and discomfort and annoyance to the occupant. Restatement (Second) of Torts § 929(1) (1965). If possible, the court would apportion the damages between that caused by the dam and that caused by natural flooding of the river. See id. § 433A(1) ("Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."); see also id. cmt. e.[3] In this case, the harm would be greater than from either of the causes and could be separated. An example of such an allocation is presented in Clemones v. Alabama Power Co., 250 F. Supp. 433 (N.D. Ga. 1966), a factually similar case in which the court apportioned between dam-caused flooding and natural flooding of land above a dam, concluding that the effect of the dam was to cause water levels to rise higher and stay longer than would have occurred solely from natural conditions. The court applied § 433A in apportioning the harm between the two causes. Clemones, 250 F. Supp. at 438-39.

¶ 18.    Taxpayer has cited a number of Vermont cases to argue that the above analysis does not represent Vermont law. The first is Town of Bennington v. Fillmore & Slade, 98 Vt. 405, 130 A. 137 (1925), where a defendant repaired and modified a dam such that it caused flooding of a town highway. In affirming the liability of the dam owner on a negligence theory,[4] this Court announced the liability of a dam owner where flooding of upstream land is caused by the dam,

---

[3] We have applied and relied upon § 433A in a number of cases. See Montgomery v. Devoid, 2006 VT 127, ¶ 32, 181 Vt. 154, 915 A.2d 270; Callan v. Hackett, 170 Vt. 609, 610, 749 A.2d 626, 628 (2000) (mem.); Lorrain v. Ryan, 160 Vt. 202, 208, 628 A.2d 543, 547 (1993); Grazulis v. Curtis, 149 Vt. 371, 373, 543 A.2d 1324, 1326 (1988).

[4] Although this is a case involving conduct that would be a trespass because the flooding of upstream lands is intentional, similar liability would be available on a negligence theory, see Restatement of Torts (Second) § 165 (1965), and § 433A(1) of the Restatement would apply whether the dam owner's liability is based on negligence or trespass. Thus, Fillmore & Slade is a relevant precedent here.

10

caused by the dam and a "freshet"—that is an increase in flow in the river from natural causes like rain storms—or caused exclusively by the freshet:

> It has been held that when a structure is so built and maintained as to set back water upon the land of another during the ordinary and usual conditions of the stream, the person so maintaining it is liable for damages caused by an unforeseen and unprecedented freshet.
>
> When the damages suffered are proximately due, directly and exclusively, to natural causes, without human intervention, which could not have been prevented by any amount of foresight, pains and care reasonably to be expected, there is no liability; because it is an act of God. But if the damages were not due exclusively to such natural causes, in other words, if the negligence of the one sought to be charged mingles with the operation of the natural causes, the injury is not in a legal sense, the act of God. So if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains and care reasonably to be expected from the defendants, but not exercised by them, they are liable. But where the maintenance of the obstruction has not the effect of causing the stream to overflow in its ordinary condition, or in times of usual high water, no liability attaches for flowage caused by unforeseen and extraordinary freshets.

Id. at 421-22, 130 A. at 144 (citations omitted). This causation law is entirely consistent with § 433A of the Restatement. The quote on which taxpayer relies is based on a situation where the damages to the landowner are caused "exclusively" by natural causes. That is not the situation here, except with respect to flooding that exceeds the 100-year flood level, and the trial court held that taxpayer would have no responsibility for any flooding above that level and any flow easement coverage for land above that level is worthless.

¶ 19. A second decision taxpayer relies upon, Perkins v. Vermont Hydro-Electric Corp., 106 Vt. 367, 380-81, 177 A. 631, 636-37 (1934), explains the same rule as Town of Bennington. A third deals with the liability of an upstream owner of land containing a stream with respect to adverse effects on a downstream landowner, a situation wholly different from that here. See Kasuba v. Graves, 109 Vt. 191, 194 A. 455 (1937). The last case, In re Buttolph, 147 Vt. 641, 527

11

A.2d 1147 (1987), also involves the liability of an upstream landowner to a downstream landowner and is irrelevant to this case.

¶ 20.    In essence, taxpayer asks that we hold that the additional water caused by the dam (1) comes before any additional water that covers the land because of the flow in the river and (2) is located only over the nineteen acres of land that can be attributed to the dam's presence.  As the trial court found, this is an oversimplification of what actually occurs.  Water, the presence of which is caused by the dam, is mixed with water that comes down the river so that all flooded land areas have a combination of water from both.  Because flow easements are provided for a particular place, they are needed wherever there is water that contains a component of water present because of the dam.  In essence, that is everywhere, at least as long there is other than a de minimus amount of dam-created water in the mix.  While it may be true that land further from the river is less likely to be flooded in a particular year, or may be flooded for only a short duration, there is no evidence of how this affects value, and the value never reaches zero as taxpayer has argued.

¶ 21.    Our analysis to this point does not rule out a properly presented theory that the value of a flow easement over a particular acre of land varies depending upon the extent of the dam owner's liability exposure if there were no flow easement and each acre is unique in that respect.  In turn, the liability exposure is affected by numerous factors including the use of the underlying land when not flooded; the frequency, duration, and extent of flooding; and the apportionment of causation between the dam and the flow rate in the river.  In a simple example, the trial court used this theory to value the flow easements covering land beyond the 100-year flood line at zero because the percentage of flooding caused by the dam at that point was miniscule.

¶ 22.    For three reasons, however, this theory was unavailable to taxpayer in this case. First, as the trial court found, and taxpayer acknowledged in its reply brief, taxpayer agreed that

12

flow easements could be valued at a uniform per acre rate unless the court could find that the value over a particular acre was zero. Second, although taxpayer's counsel raised this theory in cross-examination of the Town's appraiser, taxpayer offered no evidence to support its application. Thus, the court had no way to value a flow easement over a particular acre except where the value was zero. Finally, there was evidence by way of the Town's appraiser that a uniform per acre valuation was appropriate. The Town's appraiser testified that because the flow easement was an interest in land, its value should be established by the rights the deed conveyed rather than how the easement was actually used, and because the flow easements all provided essentially the same rights, they should be valued equally. He also opined that because the valuation could be based on the sales of multiple comparable flow easements, each with a particular per acre value, relying upon the median per acre value accounted for the variation in values from acre to acre. For any of these reasons, the trial court did not commit error in relying on a per acre value for all acreage covered by flow easements except where the value was zero. In reaching this decision, we affirm the trial court's decision to reject taxpayer's position that only the flow easements on acreage flooded solely as a result of the presence of the dam have value.

¶ 23. This brings us to the calculation of the flow easements per acre value, the second major issue. As with the issue of the amount of acreage that contained valuable flow easements, the parties were very far apart on the question of the per acre value of those easements. While both appraisers based their opinion on a sales comparison method of determining value, they differed on the relevant sales to be considered. Taxpayer's appraiser took the position that the price of sales of flow easements could not be used because they did not occur in a free market, but instead were affected by the dam owner's right to obtain the easements by eminent domain. Instead, this appraiser looked at three other kinds of sales for comparison: (1) sales of complete

hydroelectric dams and facilities with and without flow easements; (2) sales of farmland, with and without flow easements, along the upper Connecticut River Valley; and (3) sales of "limited utility" property in the Connecticut River Valley. With respect to the first type of sales, the appraiser found a difference between the price of hydroelectric dams and facilities with flow easements and those without, but judged the difference not to be statistically significant. He found in the second type of sales no difference in price that would show that land with a flow easement over it was less valuable than land without a flow easement over it. He was unable, however, to find a per acre value for flow easements that were not over limited utility land, the vast majority of the land involved in this case.

¶ 24. The appraiser looked at land in the third category because it was similar to the land covered by the nineteen acres the hydrologist found was flooded by the dam during "normal" river flow, which the appraiser found was either land with a high bank or steep grade going down to the river or low-lying flat land. As we noted above, the appraiser found that the per acre value of flow easements over limited utility land was $500 per acre. In his testimony, he concluded that the limited utility land value could be used for the land directly abutting the river up to sixty acres in the Town. For the remainder of the land, he had no opinion on the value of the flow easements.

¶ 25. The Town's appraiser also used the sales comparison approach but found, and relied on, sales of flow easements from a project on the Connecticut River in Massachusetts that effectively increased the level of the dam by three feet and required additional flow easements over land along the river in Massachusetts, New Hampshire, and Vermont. The appraiser found twenty-six deeds transferring flow easements during the period between 1987 and 1994, representing the last transfers on record. He provided limited information on each sale—the land area covered by the sale, the name of the seller, the year of the sale, the deed for the sale, and a

map of the property identifying the part covered by the flow easement. He took the median price per acre from the twenty-six sales—$969 per acre—increased it by 2.5% per year up until April 1, 2012—approximately $1700 per acre—and then decreased it by 77% to account for the difference in property values between Orange and Windham Counties. The appraiser found a $1100 per acre value of flow easements in Newbury. Multiplying that per acre value by the number of acres found by the appraiser, he reached a value of all the flow easements in Newbury of $2,160,000.

¶ 26. The trial court rejected the opinion of taxpayer's appraiser and accepted the methodology of the Town's appraiser, but with adjustments. The trial court found that taxpayer's appraiser provided no useful evidence of per acre value because his opinion relied solely on sales prices for limited utility land, part of which was the nineteen acres identified by the hydrologist as flowed over because of the dam. Although the appraiser could find no difference in the value of land burdened by a flow easement and land not so burdened, he declined to assign a value based on that analysis. He indicated that his opinion of per acre value, $500, was valid for an amount of land up to sixty acres, but not above. Because the court found that 1859 acres were covered by the flow easements, it found taxpayer's expert's opinion irrelevant to that circumstance. It found that taxpayer had not overcome the presumption of regularity that accompanied the Town's appraisal.

¶ 27. The trial court accepted the Town's appraiser's methodology. That included acceptance that the flow easement sales were not too far back in time to be comparable, that there was adequate information about them, and they could be used as comparables even though the purchaser was threatened with condemnation. The court concluded, however, that almost all the sales were of small amounts of property, unlike the acreage amounts for the properties in Newbury, and skewed the median too high. Thus, it relied on only one sale as comparable because it

15

transferred a flow easement over eighty acres of land. For that sale, it declined to adjust the per acre value for inflation because it found the price quite high. It also found the appraiser's inflation adjustment methodology to be unreliable. Thus, it found the per acre value to be $836, the per acre price of that sale. Applying that value to 1859 acres, it found the overall value of flow easements in Newbury to be $1,554,124.

¶ 28. On appeal, taxpayer challenges the court's conclusion on three grounds: (1) the trial court failed to consider its appraiser's evidence that land covered with flow easements has the same value as land without such easements; (2) the evidence of comparable sales of flow easements on which the court relied was inadmissible and was insufficient to establish fair market value; and (3) taxpayer's evidence overcame the presumption of validity of the Town's appraised value of the flow easements. We decide this issue based on the third ground.

¶ 29. The burden shifting and allocation rules for property tax appeals are set out above. Supra, ¶ 12. They were created by this Court and first announced in Schweizer v. Town of Pomfret, 134 Vt. 436, 438, 365 A.2d 134, 135 (1976), and applied and developed in numerous decisions thereafter. The first requirement, that a town produce its appraisal of fair market value and listed value, has essentially become a pleading requirement. See, e.g., Sondergeld v. Town of Hubbardton, 150 Vt. 565, 568, 556 A.2d 64, 66 (1988) (explaining town must show "initial valuation"). At that point, a presumption of validity arises. The presumption has no evidentiary weight; it is only "locative." Gardner v. Dep't of Soc. Welfare, 135 Vt. 504, 507, 380 A.2d 87, 89 (1977) (explaining locative presumption places "burden of going forward with evidence on the party against whom it operates as a rule of law and has no probative quality"). It is commonly described as a bubble that is burst in a valuation appeal if the taxpayer introduces evidence that an appraisal is higher than fair market value. See Rutland Country Club v. City of Rutland, 140 Vt.

16

142, 145-46, 436 A.2d 730, 732 (1981). This is essentially a screening requirement that is usually easily met because it is based on admissible evidence and does not consider the weight of that evidence. For example, in a personal appeal, it could be met solely by the testimony of a landowner that the value is an amount less than that found by a town because the landowner is "a competent witness to testify as to the value" of the property. 12 V.S.A. § 1604. The opinion of value is admissible even though the factfinder may give it no probative value.

¶ 30. In Rutland Country Club, we went back to our leading case on locative presumptions, Tyrrell v. Prudential Insurance Co., 109 Vt. 6, 192 A. 184 (1937), to explain the presumption in context: " 'if and when enough rebutting evidence is admitted to make a question for the jury on the fact involved, the presumption disappears and goes for naught.' " Rutland Country Club, 140 Vt. at 145-46, 436 A.2d at 732 (quoting Tyrrell, 109 Vt. at 24, 192 A. at 192). In a case where the factfinder is a judge or hearing officer, the evidence must create a factual dispute related to value that must be resolved by the factfinder. Another analogy to consider is that responding to a presumption of validity is like responding to a motion for summary judgment by showing that there is a material issue of fact that prevents judgment for the moving party as a matter of law. This analogy is helpful because it explains how the trial judge ruled in this case. The court ruled that taxpayer, who had the overall burden of proof, could not prevail as a matter of law because it offered no evidence from which the court could lawfully determine the value of the flow easements.

¶ 31. Once taxpayer did not prevail on the first issue, the amount of land over which the flow easements would be valued, it could prevail on the second only if it had evidence of the per acre value to be applied to the acreage determined by the trial court, and affirmed above. It offered no such evidence. In cross-examination by the lawyer for the State, taxpayer's appraiser testified

17

that he had no opinion of the value of flow easements over any land other than the limited utility land. Based on that testimony, the trial court observed "[taxpayer's appraiser] testified that he had no opinion as to the value of flowage easements exceeding 60 acres," and concluded that "[a]t most, [the] appraisal showed the easements should be valued at some unknown amount in excess of $500 per acre." Thus, in the trial judge's view, taxpayer's evidence could not rebut the presumption of validity of the Town's appraisal.

¶ 32.    Taxpayer has two responses to the trial court's decision. First, it argues that the appraiser's evidence that he could find no difference in value between farmland covered by a flow easement and farmland that was not so covered rebutted the presumption of validity of the Town's appraisal. The weakness in taxpayer's argument is that its position that flow easements over land, other than the small amount of land identified as flooded because of the presence of the dam, have no value was based on its view that it has no responsibility for flood damage except in that small area and not on a factual presentation that the flow easements over the farmland have no value. The court rejected that position, and we have affirmed that decision. Whatever the value of the appraiser's research into sales of farmland in the area with and without flow easements, the results were not sufficient to enable the appraiser to offer an opinion of the value of flow easements over farmland. Thus, the appraiser did not state the opinion that all flow easements over agricultural land are worthless even if the dam is responsible at least in part in flooding them. In short, the trial court ruled against taxpayer as a matter of law, not as a matter of fact. Taxpayer gave the court no evidence on which it could render a judgment for it based on its theory of the case. We must hold that taxpayer did not rebut the presumption of validity of the Town's appraisal. See City of Barre v. Town of Orange, 152 Vt. 442, 445, 566 A. 2d 951, 952-53 (1989) (holding taxpayer, City of Barre, did not rebut presumption of validity where, relying on inapplicable

statute, it based its case on listed value, and not fair market value, of alleged comparable properties).

¶ 33. This ruling necessarily answers taxpayer's second ground—that the court could not produce a valuation based on a single comparable sale of flow easements because the sale was not at arm's length, was too old, and too little relevant information was known about it to adjust its price to reflect conditions involved in the value of the flow easements at issue in this case. Once the court held that taxpayer had not rebutted the presumption of validity of the Town appraisal, it had to issue judgment for the Town. Taxpayer cannot prevail based on errors in the Town's valuation substance and procedure. See In re Bilmar Team Cleaners, 2015 VT 10, ¶ 11 (explaining taxpayer burden to overcome presumption of validity " 'cannot be met by simply impugning the [Town's] methods or questioning its understanding of assessment theory or technique' " (quoting Sondergeld, 150 Vt. at 568, 556 A.2d at 66 )).

¶ 34. The alternative is stalemate—a case in which the court could not rule for either side. In a number of cases where valuation has been very difficult, particularly involving utility property, we have stressed the need to come to a conclusion to allow the Town to levy property taxes. See Morrisville Water & Light Dep't v. Town of Hyde Park, 131 Vt. 590, 595, 313 A.2d 22, 24 (1973) ("[W]e note that the law of this State requires this Court to find some allowable mode of legalizing the collection of taxes justly due."); see also In re Montpelier & Barre R.R. Co., 135 Vt. 102, 104, 369 A.2d 1379, 1381 (1977); New England Power Co. v. Town of Barnet, 134 Vt. 498, 505, 367 A.2d 1363, 1368 (1976). Taxpayer has the ultimate burden of proof in this case, and it is appropriate to deny it the opportunity to prevail when it has not made out a prima facie case.

¶ 35.    Because taxpayer failed to rebut the presumption of validity of the Town appraisal, the Town was entitled to judgment for the full amount of that appraisal, without the downward adjustments made by the trial court.   The Town, however, did not cross-appeal from those adjustments so they must stand.

Affirmed.

FOR THE COURT:

_____

Associate Justice

20